MARY McGRENRA v. CATHERINE McGRENRA.

Orphans' Court, New Castle, September Term, 1890.

**Dower — loss of, by adultery and desertion.**

Where the wife of one of the members of a copartnership, formed for the purpose of conducting the hotel business, having left him and lived in open adultery with another man, because she could not monopolize, or at least participate in the management of the said hotel in connection with the other copartners, he having offered her another home in which to live, and he not having subsequently been reconciled to her and suffered her to dwell with him, Held, that the wife would be barred from claiming dower in his estate by section 9, chapter 87, Revised Code.

APPLICATION FOR ASSIGNMENT OF DOWER.— Petition of Mary McGrenra for assignment of dower in the estate of her deceased husband.

Thomas Davis and Daniel Bratton, for petitioner.

Willard Saulsbury, for respondent.

GRUBB, J.—This case arises upon the petition of Mary McGrenra, widow of Cornelius McGrenra, for the assignment of her dower out of certain real estate therein described, known as the Delaware House, hotel and stables, in the city of Wilmington.

The petition sets forth that the petitioner intermarried with the said Cornelius McGrenra, October 19,

1868; that he died December 2, 1889; that he was seized in fee of the said real estate during their marriage, and that whilst he was so seized thereof, and after they were so intermarried as aforesaid, he conveyed said real estate to his sister Catharine McGrenra, the respondent, without the petitioner becoming a party to and joining in said conveyance.

All of the foregoing facts were admitted or proven at the hearing of this cause.

Against the petitioner's application for dower, the respondent interposed the following pleas:

1. That no such person exists or is now living as Mary McGrenra, widow of Cornelius McGrenra.

2. That the petitioner is not Mary McGrenra, widow of Cornelius McGrenra.

3. *Ne unques accouple.*

4. That under the law, the said Mary McGrenra, if living, has forfeited her right to any dower in Cornelius McGrenra's lands, or any lands of which he was ever seized.

5. That the petitioner has forfeited her dower in said lands by adultery.

6. That the petitioner did willingly leave her husband and go with an adulterer, and thereby forfeited her right of dower in said lands.

7. That the petitioner did willingly live in adultery in a state of separation from her husband, not occasioned by his fault.

At the hearing, the allegations of the first, second and third pleas were not established by the evidence, but the contrary.

If it shall be determined that the allegations of the *seventh* plea have been sustained by the evidence introduced in the cause, then it will be unnecessary to consider and pass upon either the sufficiency of the remaining pleas or the adequacy of the testimony in support thereof.

Said seventh plea is founded upon the second provision of section 9, chapter 87 of the Revised Code.

According to the true meaning and intent of this statutory provision, the petitioner's dower in the real estate in question must be held by this court to have been forfeited if it shall appear, upon due consideration of all the evidence in the cause, that the petitioner did " willingly live in adultery in a state of separation from her husband, not occasioned by his fault," unless it shall also appear that her said husband did, subsequently thereto, become " reconciled to her and suffer her to dwell with him."

Therefore, the chief questions presented by the issue raised upon said *seventh* plea, and to be determined by the evidence relevant thereto, are,

First. Did, or not, the petitioner willingly live in adultery in a state of separation from her husband, Cornelius McGrenra?

Second. Was, or not, said state of separation from him occasioned by his fault within the meaning and intent of said statutory provision?

Third. If both of these inquiries be determined adversely to the petitioner, did, or not, the said Cornelius McGrenra, subsequently to the petitioner's guilty con-

duct, become reconciled to her and suffer her to dwell with him?

It has been conclusively proven that the petitioner left the house of her said husband and lived apart from him for a considerable time in Delaware, and then went to Pennsylvania and lived in Philadelphia in a complete and continuous state of separation from him, from the winter of 1874 until his death in December, 1889.

The respondent has produced both oral and written evidence to prove that within this period and during the year 1879, the petitioner lived in adultery in Philadelphia, with a certain James Andrews, to whom she was married by a Catholic priest, at the Roman Catholic Cathedral, corner of Eighteenth and Race streets in said city, in August of that year, and by whom she was then pregnant with a male child, of which she was delivered on October 31, 1879, and whom she named Robert Andrews.

The petitioner herself has testified that she lived in Philadelphia with a Mrs. Young, from 1874 until her death in the spring of 1879, and that she adopted the name of Mary Andrews in lieu of Mary McGrenra whilst she was living with Mrs. Young.

By her own testimony, therefore, it appears that she bore the name of Mary Andrews as early as the spring of 1879.

Mrs. Rebecca Byrne, a witness in behalf of the respondent, testifies that a Mary Andrews was employed with her at the Girard House about the end of April, 1879, and that, about the month of June in that year, she learned from her own lips that she was then preg-

nant by a man named James Andrews, who visited her frequently at the Girard House, and whom she represented to Mrs. Byrne to be her husband.

Mrs. Byrne declares that shortly after the close of the summer of 1879, her husband, William Byrne, having informed her that Mrs. Andrews had been married to James Andrews as late as August of that year, she visited Mrs. Andrews at her rooms over a saloon at the corner of Thirty-third and Market streets, Philadelphia, and found her still pregnant. She next visited her at the residence of Mrs. Jarvis, an obstetric nurse, No. 3533 Filbert street, the day after her child was born, and saw both her and the child there during this and one or two subsequent visits. She subsequently visited Mrs. Andrews several times at her apartments over a saloon at Fourth and Bainbridge streets, where she saw both James Andrews and her child with her. She had also met her frequently at the house of Charles and Julia Ferguson, and had also introduced Dr. Charles Wirgman to her. Mrs. Byrne fixes the pregnancy and marriage of Mrs. Andrews, as becoming known to her, during the summer immediately following her own marriage in April, 1879, and she declares that she positively, and without any doubt, recognizes the petitioner to be the same Mrs. Andrews of whom she has testified.

Charles Ferguson and Julia, his wife, both testify that in the summer Mrs. Andrews came to their house in a pregnant condition, and from the Girard House as she said, and informed them that a man named James Andrews was the father of her child.

At her instance, they saw Andrews and induced him to marry her. She boarded at their house two or three weeks before this marriage, at which they say they were present as witnesses thereto in the Cathedral at Eighteenth and Race streets, Philadelphia. Shortly after this marriage she left their house. They afterwards saw her in a disreputable looking house over a saloon at Fourth and Bainbridge streets with her child, a boy, named Robert Andrews, and the said James Andrews. They state that she first came to their house a year or more before this marriage, representing herself to be a widow named Mrs. McGrane; that they gave her employment; that she called upon them occasionally, and the petitioner is, without any doubt, the same person whom they knew as Mrs. McGrane and Mrs. Andrews.

Mrs. Ferguson also states that several months after the marriage, she took the child, which was then sickly, from Fourth and Bainbridge, and had it baptized for Mrs. Andrews at St. Philip's Church. In this, Mrs. Ferguson is corroborated by the baptismal record of said church, which shows that on August 1, 1880, a child named Robert Andrews, born October, 1879, son of James Andrews and Mary Dugan, was baptized there, and that Julia Ferguson was godmother for it.

Dr. Charles Wirgman testifies that he attended Mary Andrews at No. 3533 Filbert street, Philadelphia, where she gave birth to a boy in the presence of Mrs. Jarvis, now Mrs. Marshall. This was (as he says he remembers after having refreshed his memory by his note-book) on October 31, 1879. The birth of this child as the

son of James and Mary Andrews, named Robert Andrews, born October 31, 1879, at 3533 Filbert street, he says, he duly reported, as was his duty, to the registration department, Philadelphia; and in this he is corroborated by the record of said department. During this confinement he made several visits to her. A few years after her confinement he attended her on Spruce street, below Twenty-second street, during a different illness. He also, subsequent to her confinement, attended her husband, James Andrews, during his illness at Fourth and Bainbridge streets, where he found her living with him. He says he is satisfied that the petitioner is, without doubt, the Mary Andrews whom he attended upon the occasions he has stated.

Mrs. Christina Marshall testifies that prior to her marriage to her present husband, she was Mrs. Jarvis, and resided at 3533 Filbert street, Philadelphia, as an obstetric nurse.

She states that on October 31, 1879, Hallowe'en, Mary Andrews was there delivered of a male child, whom they named Robert Andrews. She came from over a saloon at Thirty-third and Market streets to her house a few weeks before her confinement, and remained there under her care until after Christmas, when she left her house and took the boy to Fourth and Bainbridge, Philadelphia.

Dr. Wirgman attended her during her confinement; Mrs. Jarvis first met Dr. Wirgman at Mrs. Rebecca Byrne's. James Andrews visited Mary Andrews during the illness following her confinement, and she represented him to be her husband. Mrs. Jarvis, at the re-

quest of Mrs. Andrews, subsequently to her confinement, visited her and took care of her child at Fourth and Bainbridge.

Mrs. Marshall (formerly Mrs. Jarvis) again saw Mrs. Andrews about two years ago, when the latter informed her that her husband, James Andrews, was in the asylum, and that her child Robert was in the country. She also testified that Mrs. Andrews had once told her that her name was Mary Dugan.

That a woman was married in Philadelphia during the summer of 1879, to a man named James Andrews, by whom she was then pregnant, and, under the name of Mrs. Mary Andrews, was, on October 31st of that year, delivered of a male child at the house of Mrs. Jarvis, No. 3533 Filbert street, is undoubtedly proven in this case.

But the petitioner contends that, although she had assumed the name of Mrs. Mary Andrews during the spring of 1879, yet she is not the Mary Andrews who was married to James Andrews and bore the child in question.

In support of this contention she has produced witnesses, some of whom testify that they saw her on the Hallowe'en of 1879, and others that they saw her so short a time before that date that she could not have been then pregnant, or they would have observed it; and all of whom declare that that they did not see any indications of her being then pregnant, and do not believe that she was then pregnant, or could have been delivered of a child either on or about October 31st of that year.

With the exception of Grace M. Tait, all of the witnesses called for this purpose by the petitioner say that they saw the petitioner on or near the Hallowe'en of 1879, and that they knew it was at this precise time, because when they saw her she was concerned about the trouble of her brother, Hugh Dugan, who was tried at the November Court at New Castle in that year, and who was convicted and sentenced to five years' imprisonment.

But it must be observed that they are testifying about her appearance and condition so long as ten years ago, when her husband, Cornelius McGrenra, was still alive, when consequently she might have been lawfully pregnant by him, and when, therefore, such a condition might not have especially impressed itself upon their memories, or even excited any particular notice.

Again, it must be remembered that Hugh Dugan was tried in December, and not in November, 1879. It is not improbable, therefore, that Mrs. Sayers, Grace Sayers, the Morgans, and possibly some of the other witnesses, may have seen her on or near Thanksgiving Day, instead of on or near Hallowe'en, and, therefore, in November instead of October, 1879, and consequently after her child was born at Mrs. Jarvis' house.    Indeed, as Hugh Dugan was sentenced in December, 1879, to five years' imprisonment, and, therefore, continued in " trouble " for that space of time, it is not altogether improbable that the petitioner's visits to Wilmington, and her concern in his behalf, may have been after his trial and during 1880, instead of during 1879, as her witnesses have supposed and testified.

After so many years, such a mistake might very naturally and readily be made.

Lizzie A. Morgan testified that her mother, Mrs. Mary Morgan, has a " very poor memory — too bad a memory to recollect well," and that she was herself only nine years old at the time of the occurrences which she has undertaken to describe.

Again, Miss Tait, although she professes to have been an intimate acquaintance of the petitioner, acknowledges that she did not know where she lived or worked after the spring of 1879; that she had never called upon the petitioner, and that the latter had never called upon her except at Wanamaker's store, where she was employed. Under these circumstances, it is not improbable that she failed to notice her pregnancy, especially in such a crowded store, even if it be certain, which it is not, that the petitioner called upon her at all during the summer or fall of 1879, for Miss Tait was unable to state positively any precise date when she called at the store, or even to show how she knew with certainty that she had called at all during that portion of 1879.

Upon careful consideration of the evidence produced on both sides, the conclusion is unavoidable that the petitioner has failed to impeach the credibility of the respondent's witnesses, and to disprove their explicit and positive identification of the petitioner as the person who, in 1879, was married to James Andrews, and delivered of a male child of which he was the father.

It does not appear that the respondent's witnesses on this subject are parties to, or in any way interested in, this suit; nor that they are relatives or personal friends,

or even acquaintances of the respondent; nor is it shown that they are not entirely unbiased and impartial witnesses.    The evidence shows that each of them had ample opportunity to become thoroughly acquainted with the personal appearance and characteristics of the petitioner, and this under such peculiar circumstances as to have impressed these strongly and distinctly on the memory of each.   All of these witnesses saw her more or less frequently for a greater or less period subsequent to her confinement; and both Charles Ferguson and his wife Julia say that on the Sunday next before the delivery of their testimony in this very case, the petitioner called at their house in Philadelphia, and urged them in a threatening manner not to appear in this court to testify against her.

It is true that Herman Peaper and wife, and Ellen Wynn, were produced by the petitioner to impeach this testimony of the Fergusons, but their testimony was too inconsistent, indefinite, and unsatisfactory to be sufficient for this purpose.

Again, there are certain significant coincidences between the facts established by the testimony of the petitioner and those proven by the witnesses produced by the respondent, which serve to corroborate the latter's identification of the petitioner.   The petitioner herself has shown that her maiden name was Mary Dugan; that she was born in Donegal, Ireland; that she assumed the name of Mrs. Mary Andrews while she was living in Philadelphia with Mrs. Young, who, she says, died in the spring of 1879; that she afterwards lived at Mrs. Davids', on Spruce street, between Twenty-first and

Twenty-second; that in 1885, and subsequently, she had a registered residence at No. 231 North Sixteenth street, and that in 1885 or 1886 she was employed at the Blockley Hospital.

These identical facts are proven in relation to the Mary Andrews regarding whom the respondent's witnesses have testified. Dr. Wirgman says that subsequent to the year 1879, he called upon the Mary Andrews, whom he had delivered of a male child in that year, and again attended her on Spruce street, below Twenty-second (the locality of Mrs. Davids' residence), and that this Mary Andrews had told him about her having nursed a Mrs. Davids.

Mrs. Julia Ferguson says that she once had an interview with the Mrs. Mary Andrews regarding whom she testified, during which said Mrs. Andrews informed her that she was then at Blockley Hospital.

Mrs. Marshall states that the Mary Andrews who was delivered at her house No. 3533 Filbert street, in 1879, once informed her that her name had been Mary Dugan.

The baptismal record of St. Philip's Church shows that the mother of the child Robert Andrews, for whom Mrs. Ferguson testifies that she had the child there baptized, was Mary Dugan, and that its father was James Andrews.

Lastly, the respondent has put in evidence a bond to the St. John's Orphan Asylum, Philadelphia, upon the binding thereto of a boy named Robert Andrews, on December 17, 1887. This bond is signed by Mary Andrews, the mother of the boy, and is accompanied by

the application and specifications required to be presented prior to the taking of the bond in such cases. In view of the testimony in this case, it appears to be satisfactorily proven that this bond was signed by the petitioner, and that the accompanying application and specifications were furnished by her to the proper officials of the asylum. Whilst without the statements contained in this bond and application there is ample evidence establishing the said identification of the petitioner, yet it is deemed proper to call attention to the significant facts therein disclosed. They show that the name of said boy was Robert Andrews; that his residence at the time of said application was 231 North Sixteenth street, Philadelphia; that the date of his birth was October 31, 1879, and the place thereof Thirty-sixth and Filbert street; that he was baptized at St. Philip de Neri Church; that his father's name was James Andrews, Norristown Asylum; that his mother's maiden name was Mary Dugan, and her native place Donegal, Ireland.

It only remains to be stated that when the petitioner was called to testify in rebuttal in her own behalf, she did not deny that she had signed said bond or presented said application and specifications to the proper officials of said asylum.

It having been established that the petitioner did willingly live in adultery with James Andrews in a state of separation from her husband, Cornelius McGrenra, during and after the year 1879, the next practical inquiry is, was, or not, said state of separation from him occasioned by his fault within the meaning and intent

of said statutory provision upon which the seventh plea
is founded?

The purpose of said provision is to extend a compas-
sionate leniency to the erring wife who has yielded to
temptation under the pressure of distress and adversity,
occasioned by the gross misconduct of her husband.
This wise clemency of the law is not extended, however,
where the fault of the husband is of a trivial character,
otherwise the sanctity of the marriage relation could not
be preserved, or the cause of morality and decency
maintained.  Nor is it extended to the wife where the
state of separation from the husband is occasioned by
her own gross misconduct.

In the present instance, it is proven that in January,
1868, Cornelius McGrenra purchased the said Delaware
House, hotel and stable properties, with the financial
aid of his sisters, Mrs. Meenan and Catharine McGrenra,
the respondent, with the view of conducting therein the
hotel business in partnership with his said sisters, they
to attend to the kitchen and general housekeeping, and
he to manage the remaining part of the business.  Un-
der this arrangement the three took possession of said
properties on March 25, 1869, and conducted the hotel
until about the close of the year 1872.

On or about said March 25th, the petitioner, having
been married to Cornelius McGrenra in October, 1868,
was brought to his home in the hotel.  In the course
of her testimony at the hearing of this cause, the peti-
tioner declares that about August, 1869, she left her
home in the hotel and remained at her father's house
until about November, 1870, because she was abused
and subjected to various annoyances by her husband's

sisters, and no sufficient provision was made there for her proper accommodation and comfort, or for her approaching confinement. At her husband's request, she returned to the hotel about November, 1870, but left on the same day, because she was, as she says, abused and beaten by her husband's sisters, Mrs. Meenan and Catharine, and returned to her father's, where she remained until about May, 1872, when at her husband's request she again returned to the Delaware House with her child Frankie, and remained about two weeks only. During this period, about June 7, 1872, she had an altercation in the kitchen with the respondent Catharine, whom she shot, as she declares, in self-defense. The next day after the shooting she left the hotel, but a few days subsequently returned for some clothing, when she was again abused by Catharine, and thereupon she left the hotel and never again attempted to make her home there.

The truth of all these alleged reasons for leaving her home in the Delaware House is flatly denied not only by the respondent upon the witness-stand, but also by Frank Woods and Harriet Brown, two disinterested witnesses, who were employed as servants in said hotel. They declare the petitioner, during her entire residence there, was treated in all respects as well as if she were a lady boarder in the hotel; that she took her meals at the regular table; was given the second-story bed chamber adjoining the parlor, it being the best room in the house, and had her wants always attended to and supplied by them and the other employees of the hotel under her husband's express instructions to them. It is also testified by them that when she lived in the hotel

she caused discord and trouble there, but when she was away from it peace and order prevailed. They also testified that she repeatedly interfered with the respondent's management of the kitchen work, and quarreled with her when there was no necessity for her to be in the kitchen at all, and that about June 7, 1872, this conduct finally culminated in a murderous assault by the petitioner with a loaded pistol upon the respondent, without legal provocation or justification. They state that prior to this occasion the respondent had always treated her in a lady-like and kindly way. They also declare that her husband always treated her with gentleness and kindness, and never otherwise, although upon various occasions she cursed him, beat him with her fists, attacked and drove him from the house with a stone, domineered over him and abused and worried him until she drove him to excessive drinking.

Although the petitioner has testified that she was beaten by Mrs. Meenan and Catharine, she nowhere states that her husband ever struck her or treated her with cruelty. She does say that he would not permit her or her child to have a physician, but Dr. Maull disproves this. She has also testified and shown by other witnesses that her husband would at times be manifestly under the influence of liquor and sometimes intoxicated. But she acknowledged that she knew of this infirmity prior to her marriage. Having married him, therefore, after due notice of his infirmity, she took him " for better, for worse," and consequently her obligation was the greater and her duty the plainer so to conduct herself as to moderate and not aggravate this propensity.

The conclusion, clearly warranted by due considera-
tion of the entire evidence produced to show by whose
fault the state of separation proven to have existed dur-
ing the year 1879 and thereafter was occasioned, is this:
The petitioner, notwithstanding that she was supplied
by her husband with a home and the comforts and at-
tentions fully corresponding with both his and her sta-
tion of life, nevertheless perversely resolved not to ac-
cept and adapt herself to these unless she could monopo-
lize, or at least participate with her husband's sisters in,
the control and management of the hotel.   This idea was
as impracticable as it was unreasonable.   Her husband
was not then in a position, owing to his need of the
financial aid of his sisters, to dissolve his partnership
with them, expel them from the premises, and conduct
the hotel alone, or in connection with his wife.   Nor
was he able to force her upon his sisters as a copartner
with them.   It was her duty, therefore, to accept the
home he gave her, especially when she was there pro-
vided, as was clearly proven, with every reasonable com-
fort and attention.   Instead of doing this, she rebelled
against his sisters' rightful control of the kitchen and
household affairs, and frequently and unreasonably in-
terfered with their management of these.   This course
of misconduct on her part, being persisted in, developed
in her a quarrelsome, violent and dangerous disposition,
which repelled the friendship of her husband's sisters
and excited their ill-feeling against her and created the
discord and strife which finally culminated in her mur-
derous and unjustifiable assault with a pistol upon the
respondent in June, 1872, and made her further resi-

dence in the hotel impossible so long as her husband's sisters retained their partnership interest therein.

At this juncture, as Patrick Haggerty has proven, he offered her one of his houses on Ninth street in Wilmington, and a home with him there apart from his sisters, which she refused to accept.

Thenceforth, by her own fault, she lived separate from his house and home.

Distressed in spirit, and worried in mind by the consequence of her misconduct towards his sisters and himself, he gradually indulged more frequently and more freely in intoxicating liquors, until having lost his wife by desertion and his property by sheriff's sale, he thereafter became disheartened and desperate, and after years of excessive intemperance, closed his unhappy career in death at the house of his sister, the respondent, who, from the date of the petitioner's desertion of him, had given him a sheltering home and the pitying care which his own wife withheld.

It is scarcely necessary to add that there is absolutely no proof that Cornelius McGrenra, subsequent to the petitioner's said guilty conduct in willingly living in adultery with James Andrews in a state of separation from her husband not occasioned by his fault, did ever become reconciled to her and suffer her to dwell with him.

The respondent's said seventh plea having been established by the evidence in this cause, it is, therefore, now ordered, adjudged, and decreed, that the prayer of the petitioner be refused, and that her petition be dismissed, with costs.